IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ZULEIKA TORRES, | ) | CASE NO.  1:20-cv-01186 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Zuleika Torres ("Plaintiff" or "Torres") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On October 20, 2017, Torres filed an application for supplemental security income

("SSI").  Tr. 12, 53, 66, 136-141.  Torres initially alleged disability beginning on January 1,

2013.[1]  Tr. 12, 53, 136.  Initially, Torres alleged disability due to anxiety, depression, and left

---

[1] If a claimant is found to be eligible for SSI benefits, benefits "are payable only as of the month after the month in which the application is filed." *Terrago v. Comm'r of Soc. Sec. Adm.*, 2014 WL 2442233, * 3 (N.D. Ohio May 30, 2014) (citing 20 C.F.R. §§ 416.335, 416.501); *see also* 20 C.F.R. § 416.202(g) (filing an application for SSI benefits is one of the SSI eligibility criteria).  Thus, "the relevant period" starts on the date the claimant's application is filed and ends on the date the hearing decision is issued. *Id.* (citing 20 C.F.R. § 416.330).

arm pain (limited range of movement). Tr. 53, 82, 88, 156. At the hearing, Torres alleged that she has problems sleeping and focusing. Tr. 17.

After initial denial by the state agency (Tr. 82-84) and denial upon reconsideration (Tr. 88-89), Torres requested a hearing (Tr. 90-92). On February 22, 2019, a hearing was held before an Administrative Law Judge ("ALJ"). Tr. 31-52. On May 2, 2019, the ALJ issued an unfavorable decision, (Tr. 9-29), finding that Torres had not been under a disability within the meaning of the Social Security Act since October 20, 2017, the date the application was filed (Tr. 12, 23). Torres requested review of the ALJ's decision by the Appeals Council. Tr. 133-135. On April 1, 2020, the Appeals Council denied Torres' request for review, making the ALJ's May 2, 2019, decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A.    Personal, vocational and educational evidence

At the time of the February 22, 2019, hearing, Torres was 23 years old and was living with her dad. Tr. 35. She received her GED in 2018. Tr. 35. Torres' work history is limited. Tr. 41-42, 48.

### B.    Medical evidence

### 1.  Treatment history

Before moving to Ohio, Torres lived in Minnesota. Tr. 240. While she was still living in Minnesota, on June 15, 2017, Torres was seen at a clinic, reporting that she had an EMG done because of numbness and tingling in both hands. Tr. 263; *see also* Tr. 266-270. The EMG was normal. Tr. 264, 267. Her symptoms were intermittent but had been present for many years. Tr. 263, 264. Torres indicated that she was let go from a job because she was required to perform

repetitive motions and was given work restrictions.  Tr. 263.  Torres indicated that conservative

management had failed.  Tr. 264.  She was referred to a hand specialist.  Tr. 264.

Also, prior to moving to Ohio, on July 17, 2017, Torres was seen at an othopedic clinic

for complaints regarding her left shoulder and right wrist.  Tr. 230.  Torres complained that her

left shoulder was popping and she had pain in her left forearm.  Tr. 230.  Also, she complained

that she had pain in her right wrist when drawing.  Tr. 230.  Torres also relayed that her

depression and anxiety were not well controlled.  Tr. 230.  Torres had been taking prescription

medication but had stopped because she was having chest pain.  Tr. 230.  Orders were placed for

"OT for custom splints for cubital tunnel syndrome" and "PT for [left] shoulder therapy[.]"  Tr.

232.  Also, Torres was provided bilateral braces to wear at night and it was recommended that

she follow up with her primary care physician regarding her anxiety and depression because it

could worsen her pain.  Tr. 232.

On August 18, 2017, Torres attended her last mental health treatment session before

moving to Ohio.  Tr. 240.  Torres was positive about her upcoming move to Ohio to live with her

father.  Tr. 240.  Torres' mental health provider indicated that "[r]ootlessness and abuse [were]

the major forces in [Torres'] life."  Tr. 240.  Torres' identity was noted to be "diffuse and her

level of maturation intellectually and interpersonally [was] pre[-]teen."  Tr. 240.  It was also

noted that Torres had "difficulty understanding the impact of her actions and [had] limited ability

to make rational choices."  Tr. 240.  Torres' "ability to think abstractly [was] marginal and her

moral compass [had] no north on it."  Tr. 240.  Torres was found to meet the criteria for a

diagnosis of major depression moderate recurrent; generalized anxiety disorder; and personality

NOS with dependent features.  Tr. 240.

On October 12, 2017, Torres was seen at Firelands Counseling ("Firelands") for an assessment.  Tr. 329.  Torres had referred herself because of a history of anxiety and depression. Tr. 329.  She reported that she was emotionally abused by her mother and was diagnosed with depression at age seven.  Tr. 329.  Torres relayed that she had "constant feelings of self-loathing, experience[d] social anxiety, and live[d] with the fear of disappointing everyone."  Tr. 329. Torres stated she had worked one day at a grocery store but quit because a customer was rude towards her and she was unable to return.  Tr. 329.  Torres reported not having a good relationship with her mother and she was not close to her sister.  Tr. 330.  However, she had a good relationship with her dad and it was improving.  Tr. 330.  She also got along with a family friend with whom she and her dad were living.  Tr. 330.  Also, Torres reported having an online relationship with a boyfriend for three years.  Tr. 330.  The diagnostic impression was major depressive disorder, moderate with anxious distress as evidenced by depressed mood, loss of interest in activities, insomnia, feelings of worthlessness, difficulty concentrating, and excessive worry.  Tr. 335.

On October 30, 2017, Torres was seen at Lorain County Health & Dentistry ("Lorain") with complaints of depression and arm pain.  Tr. 304-305.  With respect to her depression, Torres complained of having problems falling asleep and staying asleep.  Tr. 304-305.  She also reported that her medication was causing tremors and insomnia.  Tr. 305.  Torres relayed that she had pain in her shoulders that radiated into her wrists.  Tr. 305.  Torres' height was approximately 5'2" and she weighed approximately 220 pounds.  Tr. 306.  On physical examination, Torres exhibited tenderness in her left shoulder and her range of motion was moderately reduced.  Tr. 307.  Torres also exhibited limited range of motion on her left side; her grip strength was 5/5; Tinel's and Phalen's testing was negative; and her mood and affect were

appropriate.  Tr. 307.  Duloxetine (Cymbalta) was prescribed.  Tr. 307.  Also, an x-ray of Torres'
left shoulder was taken on October 31, 2017.  Tr. 324.  The impression was no acute fracture.
Tr. 324-325.

Torres attended counseling at Firelands on November 1, 2017.  Tr. 336.  Torres discussed
her relationship with her parents.  Tr. 336.  Torres relayed that her boyfriend of three years
recently broke up with her and she discussed how she managed her emotions.  Tr. 336.  Torres'
affect was full and her behavior was appropriate.  Tr. 336.

On November 20, 2017, Torres was seen at Lorain for follow up regarding her left
shoulder pain, an earache, and depression.  Tr. 299-303.  On review of symptoms, Torres relayed
being anxious; easily startled; she worried excessively; she felt down, depressed, and hopeless;
she had impaired judgment, paranoia, and racing thoughts.  Tr. 301.  On physical examination,
Torres' mood and affect were appropriate.  Tr. 302.  She weighed approximately 230 pounds.
Tr. 301.  It was noted that Torres had a history of physical and sexual abuse during her
childhood.  Tr. 299.  Torres was assessed with depression, unspecified depression type.  Tr. 302.
Torres had been off Cymbalta for three days with no dizziness and her chest discomfort was
improving.  Tr. 302.  She was not interested in starting a new medication but was interested in
counseling.  Tr. 302.  With respect to her left shoulder pain, Torres' recent x-ray was within
normal limits and Torres was instructed to follow up if she started to have more pain or did not
improve.  Tr. 302.  Torres was provided a prescription for her earache.  Tr. 303.  With respect to
Torres' weight, she was educated regarding diet and encouraged to exercise.  Tr. 303.

Torres returned to Lorain on December 4, 2017, for a follow-up visit.  Tr. 294-298.  With
respect to her earache, Torres was feeling much better.  Tr. 294.  Torres was instructed to start a
trial of Wellbutrin for her moderate episode of recurrent major depressive disorder.  Tr. 294.

Torres planned to wait until she had completed her antibiotics before starting Wellbutrin.  Tr. 294.  With respect to her weight, Torres was referred to a dietician and encouraged to exercise. Tr. 294.  On examination, Torres' mood and affect were appropriate.  Tr. 298.

During a December 13, 2017, counseling session at Firelands, Torres relayed that her primary care physician had adjusted her medication but she was waiting to finish her antibiotics before starting the new medication.  Tr. 339.  Torres reported that she had little interest in doing things and she was easily aggravated with people she lived with.  Tr. 339.  Torres' counselor worked with Torres to identify triggers and to find one new coping skill that she could use.  Tr. 339.  However, Torres was resistant to working on identifying coping skills because she felt that most coping skills did not work for her.  Tr. 339.

Subsequently, upon a referral from her treatment providers at Lorain, on December 21, 2017, Torres was seen at Charak Center for Health and Wellness ("Charak") for an evaluation and counseling.  Tr. 385.  Torres explained that she had problems with her mood, noting it was up and down.  Tr. 385.  She had problems sleeping; a constant fear of dying; racing thoughts; and lacked motivation to do daily activities.  Tr. 385.  Torres enjoyed artistic activities, e.g., digital art, crafts, clay sculpting.  Tr. 385.  On mental status examination, Torres was observed to be well groomed; her demeanor was dramatic; she had a full range of affect; her mood was expansive; her intelligence was estimated to be above average; and her behavior, cognition, memory, insight, judgment, concentration, speech, thought content, and thought process were within normal limits.  Tr. 387.  Torres was not taking the Wellbutrin that had been prescribed because she said it was a "'mood stabilizer' and she wanted to be herself."  Tr. 388.  Further evaluations were recommended.  Tr. 388.  Possible treatment recommendations included

medication management, case management, counseling, and referral to partial hospitalization due to daily depressive symptoms.  Tr. 388.

When Torres returned to Charak on December 29, 2017, she reported having a depressed mood; feeling guilt/worthlessness almost daily; mood swings; irritability; racing thoughts; energy fluctuations; decreased sleep; rapid, pressured speech; and flight of ideas.  Tr. 379-380.  Torres had not started taking Wellbutrin as prescribed by her primary care physician. Tr. 380.  Torres was diagnosed with dysthymic disorder; histrionic personality disorder; and bipolar disorder, current episode mixed, moderate.  Tr. 383-384.  A decision was made to discontinue Wellbutrin and start a trial of Abilify.  Tr. 380.  Also, Trazadone was prescribed to help Torres with sleep.  Tr. 380.

Torres saw Dr. Bhandari, M.D., at Charak on January 11, 2018, for a medication follow-up visit.  Tr. 375.  Torres had just started taking her Abilify four days earlier and indicated it was "too early to know" but she was experiencing drowsiness as a side effect.  Tr. 375.  Torres had a constricted affect.  Tr. 375.  Dr. Bhandari instructed Torres to continue with the Abilify and follow up in a month.  Tr. 375.

On January 26, 2018, Torres was seen at Lorain for follow up regarding left knee pain.  Tr. 503-504.  Torres reported symptoms of locking, numbness, and popping.  Tr. 504.  Torres relayed that since being in a car accident when she was 15 years old she had problems with her neck, left shoulder, arms, and left knee.  Tr. 504.   On physical examination, Torres exhibited tenderness and mild pain with cervical and lumbar range of motion and tenderness and moderate pain with left shoulder and left knee range of motion.  Tr. 506.  A medial ligament test revealed tenderness; there was no warmth or erythema noted but there was swelling noted.  Tr. 506.

Torres' mood and affect were appropriate.  Tr. 506.  X-rays of Torres' left knee were taken on February 6, 2018.  Tr. 392-393.  The impression was normal knee joint.  Tr. 392.

Torres returned to Charak on February 8, 2018, for a medication follow-up visit.  Tr. 372.  Torres was continuing to take Ability but reported that it was making her drowsy.  Tr. 372.  Torres was continuing to have mood swings, noting that some days she was "super happy."  Tr. 372.  At her appointment, Torres' affect was euthymic.  Tr. 372.  Dr. Bhandari prescribed Vraylar.  Tr. 372, 373.

Torres was seen at Lorain on March 16, 2018.  Tr. 497.  Torres had an MRI of her left knee but the results were not back yet.  Tr. 497.  She was seeing ortho for her left knee and was interested in a referral for her left shoulder.  Tr. 497.  Torres relayed that she was very happy with her treatment at Charak and had support at home.  Tr. 497.  Torres reported that she was seeing someone at Charak daily because she was having increased thoughts of hopelessness.  Tr. 497.  She did not feel that Vraylar was helping and planned to speak with someone at Charak about that.  Tr. 497.  Torres was educated on diet and encouraged to exercise to address her weight.  Tr. 497.  On examination, Torres exhibited decreased strength in her right shoulder (4/5); tenderness and moderately reduced range of motion in her left shoulder; strength testing with external rotation of the left shoulder was abnormal; on active range of motion of the left shoulder there was spasm and with passive range of motion of the left shoulder there was pain.  Tr. 501.  Torres' mood and affect were appropriate.  Tr. 501.

At a follow-up medication appointment on March 19, 2018, Torres reported that she tried Vraylar but it made her anxious.  Tr. 437.  Trazadone was helping Torres sleep.  Tr. 437.  Torres continued to report mood swings, noting she was mostly irritable.  Tr. 437.  Dr. Bhandari prescribed Wellbutrin.  Tr. 438.

Torres continued treatment at Charak from April through July 2018.  Tr. 416-36.  At a visit on April 16, 2018, Torres' condition was generally unchanged since her prior visit.  Tr. 433.  However, she reported sleeping better than before.  Tr. 433.  Dr. Bhandari increased Torres' Wellbutrin and continued her Trazadone.  Tr. 433.  When Torres was seen at Charak for follow up on May 4, 2018, she reported feeling much better with the increase in Wellbutrin and hoped that it would work.  Tr. 428.  She felt that the Wellbutrin had calmed her down.  Tr. 428.  However, the Trazadone was not helping with her sleep.  Tr. 428.  Torres' Trazadone was increased.  Tr. 431.

During a June 8, 2018, follow-visit at Charak, Torres relayed that the new medication regimen was giving her a headache and causing congestion.  Tr. 420.  After discussing her medication, Torres agreed to try melatonin.  Tr. 420.  Torres reported doing pretty well and indicated that her group meetings were going well.  Tr. 420.  However, she was having severe pain in her spine.  Tr. 420.  When she returned to Charak on July 6, 2018, Torres reported that the melatonin was helping and she was doing better and attending group less frequently.  Tr. 416.  However, she was continuing to have severe pain and waiting for an appointment to address her pain.  Tr. 416.  Mental examination observations were generally average or normal.  Tr. 417.

On July 30, 2018, Torres saw Dr. Thomas, D.O., at the Cleveland Clinic to evaluate her neck pain, which was on the left side and radiated into her left arm and wrist.  Tr. 455-459.  Other than some reported pain in the shoulder on range of motion and tenderness on palpation over the left trapezius muscle, examination findings were generally normal.  Tr. 457-458.  Dr. Thomas' diagnoses were cervical spinal stenosis; radiculopathy, cervical region; myalgia; and low back pain, unspecified back pain laterality, unspecified chronicity, with sciatica presence unspecified.  Tr. 459.  X-rays of the cervical and lumbar spines were taken on July 30, 2018.  Tr.

9

468-470.  The cervical spine x-ray was normal.  Tr. 468.  The lumbar spine x-ray showed scoliosis.  Tr. 469-470.  Dr. Thomas discussed surgical and non-surgical treatment options.  Tr. 458-459.  Torres was interested in proceeding with non-surgical options and Dr. Thomas recommended physical therapy.  Tr. 458-459, 461.  He also counseled Torres on weight loss, better body mechanics and posture.  Tr. 458.

Torres returned to Charak on August 3, 2018, for a medication follow-up visit.  Tr. 412-415.  It was noted that Torres' memory and attention and concentration were impaired.  Tr. 413.  Otherwise, her mental status examination findings were generally normal or average.  Tr. 413.

On August 20, 2018, Torres was seen for an office visit at Lorain.  Tr. 538-539.  Torres indicated that she was trying to get disability and she needed proof of disability in order to get food stamps.  Tr. 538.  Torres was informed that she would need to have functional capacity testing performed in order for paperwork regarding disability to be completed.  Tr. 538.  Torres was in agreement with having the functional capacity testing completed.  Tr. 538.  Torres was referred to occupational therapy for her back pain.  Tr. 538.  She was also diagnosed with obesity and counseled on diet and encouraged to exercise.  Tr. 538.

The functional capacity testing was performed on August 30, 2018, at MercyHealth.  Tr. 471-475.  Following the evaluation, the therapist concluded that Torres had the ability to work part-time performing sedentary work.  Tr. 475.  However, the therapist noted that pain questionnaire scoring indicated "a moderate trend toward symptom disability behavior[]" and objective testing for consistency indicated that "the tests results [were] **NOT VALID** and [did] not represent the client's maximum functional ability."  Tr. 474-475 (emphasis in original).

During a follow-up visit at Charak on September 4, 2018, Torres relayed that she was slightly more depressed because she was dealing with rejection.  Tr. 408.  A man whom she had

started to like was only interested in being friends.  Tr. 408.  As a result, Torres was questioning whether she would ever be in a relationship.  Tr. 408.  Dr. Bhandari added Silenor[2] to Torres' medications.  Tr. 411.

On October 2, 2018, during an appointment at Charak, Torres was doing "so so."  Tr. 404.  The Silenor was helping but she was still having problems falling asleep.  Tr. 404.  Also, Torres had been moody and had a crying spell the day before.  Tr. 404.

A few weeks later, on October 30, 2018, Torres reported doing well with her medications with occasional mild depression.  Tr. 400.  Torres indicated her anxiety was well controlled.  Tr. 400.  Torres' medications were not changed.  Tr. 400.

At a follow-up visit at Lorain on November 5, 2018, the functional capacity testing results were discussed with Torres.  Tr. 533.  The nurse explained to Torres that the test results did not qualify for disability.  Tr. 533.  The nurse ordered bone density testing.  Tr. 533.  On physical examination, it was noted that Torres' overall appearance was obese.  Tr. 536.  Otherwise, examination findings were normal.  Tr. 536.  Torres' bone density testing, performed on November 28, 2018, was within normal limits.  Tr. 482-484.

At a November 27, 2018, appointment at Charak, Torres indicated Thanksgiving was "okay" – it was just Torres and her dad for the holiday.  Tr. 610.  Torres was sleeping a little better by using a sleeping mask.  Tr. 610.  She was feeling more depressed, indicating that she was depressed almost every day.  Tr. 610.  Torres was provided samples of Rexulti to try for two weeks.[3]  Tr. 610.  Examination findings were generally normal or average.  Tr. 611-612.

---

[2] Silenor is used to treat insomnia.  *See* https://www.webmd.com/drugs/2/drug-154518/silenor-oral/details (last visited 8/16/2021).

[3] Rexulti is used to treat depression.  *See* https://www.webmd.com/drugs/2/drug-169294/rexulti-oral/details  (last visited 8/16/2021).

Torres had another appointment at Charak on December 10, 2018.  Tr. 605.  Torres reported that she felt that Rexulti was working; she felt that her moods were better but she was concerned about some tension she was feeling around her jaw (which she read could be a side effect).  Tr. 605.  Torres was advised to continue with her same medications but to discontinue the Rexulti if the muscle tension in her jaw worsened or did not improve.  Tr. 605.  Examination findings were generally normal or average.  Tr. 606-607.

On December 15, 2018, Torres was seen at the emergency room for low back pain/spasms.  Tr. 542-544.  Torres relayed that her pain started about three days earlier when she stood up from her couch.  Tr. 545.  She rated her pain a 7/10 and described it as constant.  Tr. 545.  Torres relayed that her pain was worse when ambulating and bending forward.  Tr. 545.  Her pain was not radiating.  Tr. 545.  On examination, Torres exhibited bilateral paraspinal lumbar tenderness – otherwise, examination findings, including strength, sensation, and reflexes were normal.  Tr. 547.  Straight leg raise testing was negative and Torres' gait was not ataxic.  Tr. 547.  Torres was discharged home with the clinical impression of UTI and low back pain.  Tr. 548.  She was treated with Toradol, Lidoderm patches, and provided a prescription for Naproxen.  Tr. 548. She was also given a prescription for Macrobid for her UTI.  Tr. 548.  Torres was advised to return as needed.  Tr. 548.

The following day, Torres returned to the emergency room (Tr. 559-566), complaining that she could barely walk (Tr. 562).  Physical examination findings were normal.  Tr. 564.  Because Torres described shooting pains down her leg, Torres was given a 5-day prescription for prednisone.  Tr. 565.  She was instructed to take Tylenol as needed and she was given six Oxycodone to treat severe pain.  Tr. 565.  Also, in addition to the lidocaine patches, Torres was

provided with a prescription for Flexeril.  Tr. 565.  At discharge, Torres' condition was improved and stable.  Tr. 566.

Torres had a follow-up appointment at Charak on December 24, 2018.  Tr. 600.  She reported feeling well on her medications.  Tr. 600.  The muscle tension around her jaw had improved.  Tr. 600.  Her anxiety was controlled and she was depressed only during her menstrual periods.  Tr. 600.  Torres' medications were unchanged and she was advised to keep her appointments with her case manager and counselor.  Tr. 600.  Examination findings were generally normal or average.  Tr. 601-602.

When Torres returned to Charak on January 15, 2019, for a follow-up appointment, she relayed that she had stayed home during the holidays and had nightmares about past sexual abuse.  Tr. 594.  Torres' relationship with her dad had improved.  Tr. 594.  Examination findings were generally normal or average.  Tr. 595-596. A medication (Prazosin) was prescribed for treatment of the nightmares that Torres was experiencing.  Tr. 598.  Her other medications were continued.  Tr. 594.

At a follow-up appointment at Charak on January 25, 2019, Torres relayed that her nightmares had stopped since starting Prazosin.  Tr. 589.  She indicated that her depression was mild and occasional.  Tr. 589.  She denied anxiety and reported sleeping and eating well.  Tr. 589.  Torres' medications were unchanged.  Tr. 589.  Examination findings were generally normal or average.  Tr. 590-591.

On January 11, 2019, Torres saw Dr. Berkowitz, M.D., at University Hospitals for a new patient appointment regarding her low back pain.  Tr. 617-618.  Physical examination findings indicated that Torres was morbidly obese; her gait was normal and she could walk on her heels and toes; examination of her neck was normal; there was decreased range of motion in the

thoracic and lumbar spine and mild tenderness on the left paraspinal musculature but no instability and strength was normal; examination of the upper and lower extremities was normal; straight leg raise was negative; sensation and reflexes were intact; coordination was normal; and Torres' affect was normal. Tr. 617-618. Per Dr. Berkowitz's order, lumbar spine x-rays were taken. Tr. 619. They showed scoliosis appearing around the L2-L3 level and some mild degenerative changes at the L5-S1 level. Tr. 618, 619. Dr. Berkowitz's assessment was low back pain, scoliosis, and lumbar degenerative disc disease. Tr. 618. He recommended physical therapy and pain management. Tr. 618.

## 2. Opinion evidence

### *Treating providers*

In a letter dated November 30, 2018, Nicole Schwandt, LPC, from Charak stated that, since December 21, 2017, Torres had participated in 45 group outpatient therapy sessions and 18 individual outpatient therapy sessions. Tr. 398. Ms. Schwandt indicated that Torres' symptoms included mood swings, depression, and anxiety and Torres had difficulty working with others and her anger outbursts and panic attacks significantly interfered with employment. Tr. 398. According to Ms. Schwandt, Torres was participating in treatment to "gain effective emotional regulation, relaxation, and anger management coping skills to manage mood swings and panic attacks." Tr. 398. Ms. Schwandt indicated that Torres' prognosis was guarded. Tr. 398.

On December 28, 2018, Ms. Schwandt, completed a mental impairment questionnaire. Tr. 453-454. In the questionnaire, Ms. Schwandt listed Torres' diagnoses as bipolar disorder, current episode mixed, moderate; histrionic personality disorder; and dysthymic disorder. Tr. 453. Torres' medications included Silenor, Wellbutrin SR, Zonisamide, and Rexulti with side effects of dizziness, drowsiness, and fatigue. Tr. 453. Ms. Schwandt listed the following clinical

findings: easily distractible; depressed mood; irritable; impulse control problems; chronic pain; mood swings, moderate severity; dramatic expression; and persistent sleep problems.  Tr. 453. Torres' prognosis was guarded.  Tr. 453.

The remainder of the questionnaire was a check-box form for rating Torres' ability to perform work-related activities.  Tr. 453-454.  The available ratings were "unlimited or very good"; "limited but satisfactory"; "seriously limited, but not precluded"; "unable to meet competitive standards"; and "no useful ability to function."  Tr. 453.

Ms. Schwandt concluded that Torres had an "unlimited or very good" ability to manage regular attendance and be punctual within customary tolerances; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. Tr. 453-454.  Ms. Schwandt concluded that Torres had a ""limited but satisfactory" ability to remember locations and work-like procedures and interact appropriately with the general public. Tr. 454.  Ms. Schwandt concluded that Torres was "seriously limited, but not precluded" from performing the following work-related activities: carry out very short and simple instructions; maintain attention and concentration for extended periods; understand and remember very short and simple instructions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  Tr. 453-454.  Ms. Schwandt concluded that Torres would be "unable to meet competitive standards" in the following work-related activities: carry out detailed instructions; perform activities within a schedule; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically

15

based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; understand and remember detailed instructions; and accept instructions and respond appropriately to criticism from supervisors.  Tr. 453-454.

Ms. Schwandt indicated that Torres would miss two to three days per month.  Tr. 454. Also, she indicated that Torres would be off task four hours per day.  Tr. 454.

### *State agency reviewing consultants – physical*

On January 6, 2018, state agency reviewing consultant Diane Manos, M.D., completed a physical RFC assessment.  Tr. 59-61.  Dr. Manos found that Torres had the RFC to occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and she was limited to pushing and/or pulling frequently with her bilateral upper extremities.  Tr. 59-60.  With respect to postural limitations, Dr. Manos found that Torres would be limited to occasionally climbing ladders/ropes/scaffolds and crawling.  Tr. 60.  Dr. Manos found that Torres would be limited to frequently reaching with her bilateral upper extremities in all directions.  Tr. 61.  Dr. Manos explained that the limitations were based on cubital tunnel syndrome at the elbow and left shoulder pain.  Tr. 60, 61.

Upon reconsideration, on April 6, 2018, state agency reviewing consultant Dimitri Teague, M.D., affirmed Dr. Manos' findings.  Tr. 74-76.  In doing so, Dr. Teague noted that Torres alleged a new condition of left knee pain but observed that a January 2018 x-ray showed a normal left knee joint and concluded that there was no significant change or worsening in Torres' condition.  Tr. 75.

### *State agency reviewing consultants – psychological*

On January 4, 2018, state agency reviewing psychologist Courtney Zeune, Psy.D.,
completed a psychiatric review technique ("PRT") (Tr. 57-58) and mental RFC assessment (Tr.
62-64).  In the PRT, Dr. Zeune found that Torres had mild limitations in her ability to
understand, remember or apply information; moderate limitations in her ability to interact with
others; moderate limitations in her ability to concentrate, persist or maintain pace; and moderate
limitations in her ability to adapt or manage oneself.  Tr. 58.

In the mental RFC assessment, with respect to understanding and memory limitations,
Dr. Zeune noted that Torres had her GED and found that Torres was able to understand and
remember short and occasional multi-step tasks.  Tr. 62.  With respect to sustained concentration
and persistence limitations, Dr. Zeune found that Torres was able to perform short and
occasional multi-step tasks in a setting with flexible pace and production requirements.  Tr. 62-
63.  With respect to social interaction limitations, Dr. Zeune noted that Torres reported social
anxiety and found that Torres was able to interact superficially with a small group of familiar
coworkers in a setting with infrequent public contact.  Tr. 63.  With respect to adaptation
limitations, Dr. Zeune commented that Torres worked only one day and was dependent on other
people for assistance with activities of daily living but found that Torres was able to adapt to a
routine work setting where changes are infrequent.  Tr. 63.  As additional explanation for her
mental RFC assessment, Dr. Zeune explained that Torres' allegations were partially consistent,
noting that, while Torres reported being able to pay attention for a few minutes, did not talk to
people, and is uncomfortable around others, she was in treatment and related appropriately at
most of her mental health outpatient visits.  Tr. 64.  Dr. Zeune concluded that Torres retained the
mental ability to perform simple, routine tasks in an environment where contact with others is
superficial and infrequent.  Tr. 64.

Upon reconsideration, on April 5, 2018, state agency reviewing psychologist Cynthia Waggoner, Psy.D., completed a PRT (Tr. 71-72) and mental RFC assessment (Tr. 76-78).  Dr. Waggoner affirmed Dr. Zeune's PRT and mental RFC assessment.  Tr. 71-72, 76-78.  In doing so, Dr. Waggoner explained that Torres reported an increase in hopelessness but, on examination, Torres' behavior, cognition, memory, insight/judgment, concentration, and speech were within normal limits; her mood was expansive with a full range of affect; and her thought content and thought processes were within normal limits.  Tr. 72, 78.  Dr. Waggoner concluded that there were no significant changes or worsening present.  Tr. 72, 78.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Torres testified and was represented by counsel at the hearing.  Tr. 34-47.  Torres does not have her driver's license.  Tr. 35.  Torres relayed that she has tried to drive in the past but has been too anxious to stay focused.  Tr. 35.  Torres' case manager drove her to the hearing.  Tr. 38.

Torres indicated that she enjoyed doing "digital painting, digital art."  Tr. 37.  She uses her computer for the digital art and uses different software.  Tr. 37.  However, Torres indicated that she does not use her computer as much as she would like to.  Tr. 37.

Torres acknowledged having dealt with depression and anxiety since she was a young child.  Tr. 38-39.  Also, Torres had difficulty sleeping and had to take sleep medication.  Tr. 39.  With her sleep medication, Torres was not sleeping for a full night of sleep (which she indicated would be nine hours) but she was able to sleep more than the two or four hours that she slept without medication.  Tr. 39.

Torres described her normal daily schedule, indicating that, after waking up, she helps her dad with what she can; they watch some television together; and they have dinner.  Tr. 39.

Torres does not have friends who live locally. Tr. 39. She does have some friends that she communicates with online. Tr. 39. She also talks online with other individuals who are interested in digital art. Tr. 39-40.

When asked whether she would be able to work a full-time job, Torres indicated that she "find[s] it difficult to focus on simple tasks, even at home, and it -- I worry a lot about that." Tr. 40. When asked about her past work experiences, Torres explained that she worked for about a month at a warehouse store making sure shelves were stocked and putting items in their place. Tr. 40. She indicated that she had "some clashes" with coworkers while she was working at the warehouse store. Tr. 40. Torres explained that she would get angry with other coworkers and did not really get along with them; she had trouble focusing and would always get yelled at. Tr. 40. After working at the warehouse store, Torres worked at a factory shop for a week. Tr. 41. While working at the factory job, Torres found out she had a problem with her arm (neuropathy), and it was difficult for her to focus with all the noise from the machinery and all the people talking at once. Tr. 41-42.

Torres wears braces on both her hands when she sleeps. Tr. 42. By doing so, she wakes up with less pain and it is easier for her to use her hands during the day. Tr. 42. There are times when Torres has to wear her braces during the day, especially on the left because the pain in her left arm does not go away for a day or two. Tr. 42. Because of the problems in her arms, especially her left, it is hard for Torres to lift and move items – if she holds things for too long she drops them. Tr. 42-43. As examples, Torres explained that holding coffee mugs and washing dishes is hard and she has dropped her phone several times. Tr. 43. Torres and her dad try to keep the house clean the best that they can. Tr. 44. Torres is no longer motivated to keep

her room cleaned or organized like she once did.  Tr.  45.  She also is not motivated to do other things like get up, brush her teeth or hair, shower, or change her clothes.  Tr. 45-46.

Torres relayed that being unable to do what she wants to do makes her sad and depressed. Tr. 46.  For example, she does not like her room to be messy, but she really cannot bend over or even get out of bed sometimes to be able to clean it.  Tr. 46.  Torres goes grocery shopping because she has to.  Tr. 47.  When she is able to have a case manager take her for groceries, it is easier for her and sometimes her dad will go with her and a case manager.  Tr. 47.

### 2.    Vocational Expert

A Vocational Expert ("VE") testified at the hearing.  Tr. 48-51.   The ALJ noted that Torres did not have a significant work history and proceeded to ask the VE a series of hypothetical questions.  Tr. 48.

For his first hypothetical, the ALJ asked the VE to assume an individual the same age and with the same education and work experience as Torres who is limited to medium work with the following additional limitations – limited to frequent reaching in all directions with both upper extremities; limited to occasional climbing of ladders, ropes, and scaffolds; limited to occasional crawling; limited to simple tasks and following simple instructions; able to interact superficially with a small group of familiar coworkers; only occasional interaction with the public; and few, if any, workplace changes.  Tr. 48.  The VE indicated that there would he jobs in the national economy that the individual described in the first hypothetical could perform, including dining room attendant, an SVP 2, unskilled, medium exertion position; industrial cleaner, an SVP 2, unskilled, medium exertion position; and linen room attendant, an SVP 2, unskilled, medium

exertion position.[4]  Tr. 48-49.  The VE provided job incidence data for each of the identified jobs.  Tr. 48-49.

For his second hypothetical, the ALJ asked the VE consider the first hypothetical with two additional limitations, i.e., the individual would be off task more than 20 percent of the workday and would miss or be unable to complete two or more workdays per month.  Tr. 49.  With those additional limitations, the VE indicated that the described individual would be unable to perform the jobs the VE previously identified.  Tr. 49.

Torres' counsel asked the VE whether "[i]t would be correct to say that the ALJ's limitation to simple tasks, simple instructions would preclude the ability to carry out detailed written and oral instructions[.]"  The VE responded "Yes." Tr. 49.  In response to further questioning by Torres' counsel, the VE confirmed that each job in the Dictionary of Occupational Titles ("DOT") has an SVP and reasoning level associated with it, with the SVP addressing the amount of time it takes an individual to learn a job.  Tr. 49-50.

Torres' counsel also asked the VE whether it would "be correct to say that all of these jobs have some type of production or pace standard that's set by the employer?"  In response, the VE stated, "Yes, they're goal-oriented.  There is a set standard of pace."  Tr. 50. The VE added, "Well, there's a pace.  There's an expectation, you know, of jobs.  They're not production, but like a dining attendant's [sic] expected to, you know, just go out and, you know, like bus the table whenever it's need."  Tr. 50.  Also, the VE explained, "The cleaner would -- in the industrial place, a lot of times it's janitorial type.  They would maybe wash down an area, clean

---

[4] SVP refers to the Dictionary of Occupational Title's listing of a specific vocational preparation (SVP) time for each described occupation.  Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).  "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *Id.*

up the area after work hours[]" and "[t]he linen room attendant would be collecting, counting, distributing the -- setting table linens in a stockroom or such."  Tr. 50-51.

Torres' counsel then followed up, asking the VE, "And those employees in those jobs are expected to abide by those pace and production requirements, correct?"  Tr. 51.  In response, the VE stated, "Well, correct, you have to be doing your work.  If you're not doing, you know, what a supervisor is expecting of you and your coworker's doing it all, I mean, you're not going to be working."  Tr. 51.  In response to further questioning by Torres' counsel as to whether "it would be unacceptable for an employee to ask for flexibility with those pace and production requirements[,]" the VE indicated "that would become an assisted position, an accommodation of sorts."  Tr. 51.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[5] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[6] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his May 2, 2019, decision, the ALJ made the following findings:[7]

---

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

[7] The ALJ's findings are summarized.

1.      Torres has not engaged in substantial gainful activity since October 20, 2017, the application date.  Tr. 14.

2.      Torres has the following severe impairments: lumbar spine disorder, scoliosis, arthropathies, bipolar disorder, histrionic personality disorder, and dysthymic disorder.  Tr. 14.

3.      Torres does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 15-16.

4.      Torres has the RFC to perform medium work as defined in 20 C.F.R. § 416.967(c) with the following additional limitations: frequent reaching in all directions bilaterally; occasional climbing of ladders, ropes, or scaffolds and crawling; can perform simple tasks and follow simple instructions; can interact superficially with a small group of familiar coworkers; can occasionally interact with the public; and can perform work with few workplace changes.  Tr. 16-20.

5.      Torres has no past relevant work.  Tr. 20.

6.      Torres was born in 1995 and was 21 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 20.

7.      Torres has at least a high school education and is able to communicate in English.  Tr. 20.

8.      Transferability of job skills is not an issue because Torres does not have past relevant work.  Tr. 20.

9.      Considering Torres' age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Torres can perform, including dining room attendant, industrial cleaner, and linen room attendant.  Tr. 21-23.

Based on the foregoing, the ALJ determined that Torres had not been under a disability, as defined in the Social Security Act, since October 20, 2017, the date the application was filed. Tr. 23.

### V. Plaintiff's Arguments

Torres presents three main arguments, with her first argument containing multiple "sub-arguments."[8] Doc. 15-1, pp. 9-20.

First, Torres argues that the ALJ failed to properly evaluate the totality of the evidence. Doc. 15-1, pp. 9-16. Within this first argument, Torres presents various "sub-arguments," including claims that: the ALJ should have concluded that the combination of her shoulder and arm problems limited her to no more than occasional use of her upper extremities; the ALJ erred in consideration of her mental health impairments and consideration of the opinion evidence relating to Torres' mental health impairments; the ALJ erred in his consideration of the FCE; the ALJ ignored evidence regarding Torres' unsuccessful attempts to work; and the ALJ failed to evaluate Torres' obesity in combination with all her severe impairments and failed to consider the combined effect of her physical and psychological impairments. Doc. 15-1, pp. 9-16.

Second, Torres argues that the ALJ erred in his evaluation of Torres' subjective allegations regarding her symptoms. Doc. 15-1, pp. 16-19.

Third, Torres argues that the ALJ did not satisfy his burden at Step Five. Doc. 15-1, pp. 19-20. Torres contends that the ALJ should have relied on testimony from the VE that was provided in response to hypothetical questions that included limitations not included in the ALJ's RFC. Doc. 15-1, pp. 19-20. Torres also contends that the ALJ improperly overruled Torres' objection to the VE's testimony and failed to question the VE as to whether his testimony contained any conflicts. Doc. 15-1, p. 20.

### VI. Law & Analysis

---

[8] When submitting future briefs before this Court, counsel is urged to more clearly identify each argument being presented rather than presenting arguments under a general "heading" or as a general "argument."

A.      **Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be

conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.

Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v.

Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

B.      **The ALJ did not err in his evaluation of the evidence in the record**

As noted above, within Torres' first argument, she raises multiple sub-arguments, many

of which are not fully developed and therefore may be waived.  *See McPherson v. Kelsey*, 125

F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.  It is not

sufficient for a party to mention a possible argument in the most skeletal way, leaving the court

to . . . put flesh on its bones.") (internal citations omitted) (alterations in original).  Nevertheless, to the extent not waived, the Court has addressed the various arguments below.

      **1.**      **ALJ's consideration of limitations relating to Torres' upper extremities**

The ALJ limited Torres to frequent reaching in all directions bilaterally.  Tr. 16.  Torres argues that the ALJ should have concluded that the combination of her shoulder and arm problems limited her to no more than occasional use of her upper extremities.  Doc. 15-1, p. 10; Doc. 19, p. 1.  Torres argues that her own testimony regarding difficulties she has with her arms and her testimony that she wears braces at night support more restrictive upper extremity limitations than the ALJ found.  Doc. 15-1, p. 10.  In her reply brief, she adds that a July 30, 2018, Cleveland Clinic examination noted possible cervical radiculopathy due to arm pain being unresponsive to medical management.  Doc. 19, p. 1 (citing Tr. 457).

The ALJ considered Torres' testimony regarding the problems with her arms and that she wears braces at night on her hands.  Tr. 17 (discussing hearing testimony).  The July 30, 2018, treatment note that Torres points to does not establish that the ALJ's consideration of her upper extremity limitations is flawed or unsupported by substantial evidence.  The ALJ considered the treatment notes from the July 30, 2018, visit at the Cleveland Clinic.  Tr. 17 (discussing July 2018 spine specialist evaluation (Exhibit 11F)).  Although the ALJ did not specifically reference the comment regarding possibly cervical radiculopathy, "an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. Nov. 18, 2004) (internal citation and quotations omitted).   Furthermore, as noted by the ALJ, other than an indication of scoliosis, the lumbar and cervical spine x-rays showed no significant abnormality.  Tr. 17 (citing Exhibit 11F, 15-16 (Tr. 468-469).  Additionally, the ALJ considered other evidence relating to Torres' upper extremities, including evidence that in

January 2018 Torres exhibited moderate pain in the left shoulder on range of motion but in January 2019 Torres had normal range of motion in the upper extremities.  Tr. 17 (citing Exhibit 14F, 21 (Tr. 506)); Tr. 18 (citing 18F (Tr. 616-619)).

There is no indication that the ALJ failed to consider evidence regarding Torres' allegations regarding problems with and limitations relating to her upper extremities or medical evidence relating to her upper extremities.  Thus, contrary to Torres' contention (Doc. 19, p. 1), her argument amounts to a request that the Court reweigh the evidence.  However, that is not this Court's role.  *See Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").   Moreover, the ALJ's upper extremity limitations are supported by the opinions of the state agency reviewing consultants who found that Torres had the RFC to perform frequent reaching in all directions with her bilateral upper extremities.  Tr. 61, 75.

For the foregoing reasons, the Court finds that the ALJ did not err in his consideration of Torres' upper extremities' limitations.

## 2. ALJ's evaluation of Torres' mental health impairments

Torres argues that the ALJ erred in her evaluation of her mental health impairments and consideration of the opinion evidence relating to Torres' mental health impairments, arguing that the ALJ erred in finding that Torres had only moderate limitations in the areas of mental functioning.  Doc. 15-1, pp. 10-13.

Where a "claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, 'unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 2007 WL 444808, * 3 (6th Cir. Feb. 9,

2007) (citing 20 C.F.R. § 404.1520a(d)).  In this case, when assessing whether Torres' mental impairments were severe or not, the ALJ considered each of the four broad functional areas and concluded that Torres had moderate limitations in all four functional areas (understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself).  Tr. 15-16

In reaching her findings, the ALJ considered and relied upon evidence in the record, including mental examination findings, activities of daily living, Torres' subjective allegations, and the opinions of the state agency medical consultants.  Tr. 15-16.  Torres contends that, when concluding that she had no more than moderate limitations in the four functional areas, the ALJ did not adequately address limitations contained in the evidence.  Doc. 15-1, pp. 10-11.  For example, she asserts that the ALJ noted that there was evidence of circumstantial thought process and impaired memory in the record and therefore the ALJ's basis for finding that Torres had only a moderate limitation in understanding, remembering, and applying information is unclear.  Doc. 15-1, pp. 10-11.  The Court disagrees.  As set forth in his decision, when reaching his finding that Torres had only moderate limitations in the area of understanding, remembering, or applying information the ALJ also considered and explained that treatment records generally showed normal cognition and memory (Tr. 15) and Torres has not argued or shown that the records do not support this finding.

Torres also argues that because the ALJ found the state agency reviewing consultants' opinions somewhat persuasive it was error for the ALJ not to adopt all the limitations contained in their opinions.  Doc. 15-1, p. 11.  In particular, Torres argues that the ALJ should have included in the RFC flexible pace and production requirements; superficial interaction with a small group of familiar coworkers in a setting with infrequent public contact; and a limitation to

account for having worked only one day and being dependent on others for assistance with activities of daily living.  Doc. 15-1, p. 11.  Initially, the Court notes that this argument like others made in this appeal is presented in a scattershot and cursory manner and therefore may be deemed waived.  For example, the state agency medical consultants did not indicate that Torres had the RFC to work one day.  Rather, that was evidence that the state agency reviewing consultants considered when assessing Torres' RFC.  Tr. 57 (discussing psychological evaluation treatment notes indicating that Torres was easily overwhelmed and worked one day at a grocery store); Tr. 63 (noting Torres only worked one day but finding that she was able to work in a routine setting where changes are infrequent).  Assuming arguendo that Torres' argument is properly presented and not waived, for the reasons explained below, the Court finds the argument to be without merit.

When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009).  And, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).

Furthermore, an ALJ is not obligated to explain each limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014) ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight.").

Moreover, although the ALJ did not adopt the state agency reviewers' limitations verbatim, the ALJ explained that he accommodated Torres' moderate limitations in her ability to concentrate, persist, or maintain pace and adapt or manage herself by limiting her to few workplace changes.  Tr. 19.  While Torres contends that the ALJ should have further restricted her by including a specific limitation of flexible pace and production requirements, she has failed to show that the ALJ was obligated to do so.  Also, the ALJ included social interaction limitations in the RFC, i.e., superficial interaction with a small group of familiar coworkers and occasional interaction with the public.  Tr. 16.

Torres also takes issue with the ALJ's finding that Ms. Schwandt's November 30, 2018, letter and mental impairment questionnaire were not persuasive.  Doc. 15-1, pp. 11-12.  The ALJ explained his reasoning, finding the opinions "not consistent with the claimant's own treatment records . . ., [and] as outlined above, the claimant experiences no more than moderate limitations in mental functioning."  Tr. 20.  "Therefore, the objective evidence of record does not support such extreme limitations and Ms. Schwandt provides no objective evidence that would support these limitations."  Tr. 20.  Torres contends that the treatment records, in particular a January 15, 2019, record indicating that Torres stayed home over the holidays and had nightmares reliving traumatic memories, support Ms. Schwandt's November 30, 2018, letter and questionnaire and

therefore the ALJ erred in finding the opinions not persuasive.  Doc. 15-1, p. 12.  However, it is not this Court's role to engage in a reweighing of evidence considered by the ALJ.  *Garner*, 745 F.2d at 387.   Additionally, even if the January 15, 2019, treatment record shows that her symptoms were not under control at that time, observations regarding Torres' mental status during that same office visit were generally normal (Tr. 595-596) and, approximately two weeks after being prescribed medication for her nightmares (Tr. 598), Torres reported that her nightmares had resolved (Tr. 589).  Moreover, reversal is not warranted because she has not shown that the ALJ's decision is not supported by substantial evidence.  *Jones*, 336 F.3d at 477. (Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ.").

Considering the foregoing, the Court finds that the ALJ did not err in his consideration of Torres' mental health impairments or opinion evidence relating to those impairments and Torres has not shown that the ALJ's mental RFC assessment is unsupported by substantial evidence.

### 3. ALJ's consideration and weighing of the physical FCE

Torres contends that the ALJ improperly ignored the testing and conclusion contained in the FCE which concluded that Torres could perform part-time sedentary work.  Doc. 15-1, p. 13. The Court finds this argument meritless.  The ALJ clearly considered the FCE along with the testing and conclusions contained therein.  Tr. 20.  Furthermore, the ALJ explained his reasoning for finding the FCE not persuasive, including the fact that the conclusions were not supported by the objective examination findings, e.g., "range of motion of the upper extremities was within normal limits, and strength was intact except for slightly limited strength in the left shoulder[]"; "[r]ange of motion of the lower extremities were normal except for straight leg raises and

bilateral hip flexion[]"; "[s]trength was also slightly limited in the left lower extremity."  Tr. 20, 472.  Additionally, the ALJ took into account the fact that the FCE test results were deemed not valid.  Tr. 20, Tr. 473 ("test results are **NOT VALID** and do not represent the client's maximum functional ability[]") (emphasis in original).

Considering the foregoing, the Court finds that the ALJ sufficiently explained his reasons for finding that the FCE conclusions were not persuasive.  Also, the Court finds that the ALJ weighed the FCE in accordance with the regulations and his findings relative to the FCE are supported by substantial evidence.

### 4.    ALJ's consideration of Torres' unsuccessful work attempts

Torres argues that the ALJ ignored evidence regarding Torres' unsuccessful attempts to work.  Doc. 15-1, p. 14.  In support of this contention, Torres points to the letter dated November 30, 2018, signed by Ms. Schwandt wherein it was noted that Torres' symptoms would significantly interfere with employment.  Doc. 15-1, p. 14.  Also, Torres points to her testimony regarding the difficulties she had sustaining work and maintaining focus.  Doc. 15-1, p. 14.

As with other arguments raised by Torres in this appeal, the ALJ did not ignore this evidence.  Tr. 16, 17 (discussing Torres' testimony that she had trouble focusing); Tr. 17 (discussing Torres' testimony that she stopped working because of problems she had getting along with coworkers); Tr. 19 (discussing Ms. Schwandt's November 30, 2018, letter).

Considering the foregoing, the Court finds no merit to Torres' claim that the ALJ ignored evidence regarding her difficulties sustaining work or maintaining focus.

### 5.    The ALJ's evaluation of Torres' obesity in combination with all her severe impairments and consideration of the effect of the combination of Torres' physical and psychological impairments

Torres argues that the Commissioner's decision should be reversed because the ALJ failed to evaluate Torres' obesity in combination with all her severe impairments. Doc. 15-1, pp. 14-16. Torres also asserts that the ALJ did not consider the effect of the combination of her physical and psychological impairments and whether they supported the RFC for medium level exertional work. Doc. 15-1, p. 15.

SSR 02-1p, *Evaluation of Obesity*, 2002 WL 34686281 (Sept. 12, 2002), does not establish a particular formula or method for evaluating obesity at each of the sequential steps in the evaluation process. *See Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-412 (6th Cir. Jan. 31, 2006) ("Social Security Ruling 02-01p does not mandate a particular mode of analysis."); *see also Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. Dec. 22, 2009) ("'Social Security Ruling 02-01p does not mandate a particular mode of analysis,' but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.") (quoting and relying on *Bledsoe*, 165 Fed. Appx. at 411-412).

Assuming arguendo that the ALJ erred by not mentioning evidence of obesity, such error is not a basis for reversal because Torres has failed to explain how or point to evidence indicating that her obesity is a disabling impairment or that her obesity required more restrictive limitations than those contained in the ALJ's RFC assessment. *See Long v. Comm'r of Soc. Sec.*, 2019 WL 4871425, * 3 (Oct. 3, 2019) ("Given that neither Mr. Long nor his medical evidence gave any indication that his obesity was in any way disabling, the ALJ had no cause to consider it, and the failure to do so was not error."); *Boley v. Comm'r of Soc. Sec.*, 2013 WL 1090531, * 4 (E.D. Mich. Mar. 15, 2013) ("Plaintiff 'had the burden of showing specifically how the obesity, in combination with other impairments, limited her ability to a degree inconsistent with the ALJ's RFC determination. Accordingly, even assuming the ALJ erred by failing to discuss the effects

of her obesity and violated S.S.R. 02–1 p, the Social Security Ruling concerning the evaluation of obesity in disability claims, Plaintiff has failed to show this error was harmful such that remand or reversal is warranted.") (internal citations omitted).

Torres' claim that the ALJ did not consider the effect of the combination of her physical and psychological impairments and whether they supported the RFC for medium level exertional work (Doc. 15-1, p. 15) is undeveloped and therefore deemed waived.  Even if not waived, her argument is without merit.  As explained by the Sixth Circuit, ""[a]n ALJ's individual discussion of multiple impairments does not imply that [s]he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet" a listed impairment."  *Hill v. Comm's of Soc. Sec.*, 560 Fed. Appx. 547, 551 (6th Cir. Mar. 27, 2014) (quoting *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)).  The ALJ clearly considered Torres' physical and psychological impairments as well as the combination of those impairments when evaluating her disability claim and assessing her RFC.  Tr. 14 (finding that Torres did not have an impairment or combination of impairments that met or equaled a listing).

For the reasons set forth above, the Court finds that the ALJ did not err with respect to his consideration of obesity or the combination of Torres' impairments.

## C.      The ALJ did not err in his assessment of Torres' subjective allegations

Torres argues that the ALJ did not properly assess the credibility of her subjective allegations.  Doc. 15-1, pp. 16-19.

A claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 416.929(a); SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304 (Oct. 25, 2017).   When a claimant alleges

impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 416.929(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain.  SSR 16-3p, 2017 WL 5180304, * 3-4.  Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id.* at * 3, 5-8.

To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8.  In addition to this evidence, the factors set forth in 20 C.F.R. 416.929(c)(3) are considered.  *Id.* at *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.*  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*. at * 10.

An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

Torres argues that the ALJ failed to mention evidence that supports her subjective allegations regarding her symptoms and contends that the ALJ's analysis is insufficient.  Doc. 15-1, pp. 16-19.  However, the evidence that Torres points to was not ignored by the ALJ.  For example, the ALJ considered and discussed evidence regarding Torres' alleged problems with focusing (Tr. 16, 17) and an August 18, 2017, treatment note describing Torres' "level of maturation intellectually and interpersonally . . . pre-teen" and that Torres had "difficulty understanding the impact of her action, [had] limited ability to make rational choices, and her ability to think abstractly [was] marginal[]" (Tr. 18 (citing Exhibit 2F, 4 (Tr. 240))).

Torres also claims that the ALJ's determination that her subjective allegations were not entirely consistent with the objective and other evidence of record was error because her testimony regarding her inability to focus and lack of motivation is consistent with the treatment note of August 18, 2017.  Doc. 15-1, p. 18.   However, the ALJ did not ignore evidence and reached his conclusion having considered the entirety of the record, including evidence of generally normal mental status examination findings.  Tr. 15-16, 18-19 (citing *e.g.*, Exhibit 7F, 23 (Tr. 387), Exhibit 9F, 5 (Tr. 401), Exhibit 9F, 33 (Tr. 429), Exhibit 17F, 8 (Tr. 591)).

Also, contrary to Torres' claim, the ALJ properly considered evidence regarding her complaints of pain in her wrists and shoulders.  Tr. 17.  When assessing the consistency of those

allegations with other evidence, the ALJ considered physical and neurological examination findings as well as diagnostic testing.  Tr. 17-18

Here, the ALJ considered the evidence of record, including evidence that Torres points to in support of her claim, but did not find Torres' allegations entirely credible.  It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Moreover, Torres has not shown that the ALJ's assessment of her subjective complaints is unsupported by substantial evidence.  Thus, even if evidence that Torres points to supports her position, reversal is not warranted.  *Jones*, 336 F.3d at 477.  (Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ.").

Considering the foregoing, the undersigned finds that Torres has not shown that the ALJ ignored evidence when assessing Torres' subjective allegations nor has she shown that the ALJ did not sufficiently explain her analysis.  Accordingly, the Court finds no error with respect to the ALJ's assessment of Torres' subjective allegations of her symptoms.

**D.    The ALJ did not err at Step Five**

Torres argues that the ALJ did not satisfy his burden at Step Five.  Doc. 15-1, pp. 19-20. First, Torres contends that the ALJ should have relied on testimony from the VE that was provided in response to hypothetical questions that included additional limitations beyond those contained in the ALJ's RFC, i.e., the need to have a job with flexible pace and production requirements and/or that the individual would be off task 20 percent of the workday and miss two or more workdays per month.   Doc. 15-1, pp. 19-20.

This contention is in essence a challenge to the RFC.  However, an ALJ is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. Aug. 18, 2009).  To satisfy his burden at Step Five, the Commissioner must make "a finding supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Secretary of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)(alteration in original).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question[].]"  *Id.* (internal citation omitted).

Here, to support his Step Five determination, the ALJ relied upon VE testimony in response to a hypothetical question that reflected the limitations contained in the ALJ's ultimate RFC assessment.  As discussed earlier, Torres has not shown that the RFC is unsupported by substantial evidence.  Nor has she shown that the ALJ erred in his evaluation of the evidence or when assessing Torres' subjective allegations regarding her symptoms.  Accordingly, the Court finds that the ALJ did not err by not relying on responses to hypothetical questions that contained more restrictive limitations than those included in the ALJ's RFC.

Second, Torres contends that the ALJ improperly overruled Torres' objections to the VE's testimony and failed to question the VE as to whether his testimony contained any conflicts.  Doc. 15-1, p. 20.  The ALJ provided detailed reasons in his decision for overruling Torres' objections.  Tr. 21-23.  Yet, in a cursory manner, Torres asserts that the ALJ did not properly consider the evidence when overruling her objections and did not properly determine whether there were conflicts in the VE's testimony.  Doc. 15-1, p. 20.  The Court finds Torres' argument in this regard undeveloped and therefore waived.  *McPherson*, 125 F.3d at 995–996

("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").  Also, the Court finds Torres' attempt to assert new arguments in her reply brief futile. *Hamilton v. Astrue*, 2010 WL 1032646, * 6 (N.D. Ohio Mar. 17, 2010) ("A plaintiff cannot wait until the reply brief to make new arguments, thus effectively depriving the opposing party of the opportunity to expose the weaknesses of plaintiff's arguments.") (citing*, Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)).

Considering the foregoing, the Court finds that the ALJ did not err at Step Five.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: August 16, 2021                            /s/ Kathleen B. Burke
                                                  Kathleen B. Burke
                                                  United States Magistrate Judge